16 MAG 0324     ORIGINAL

Approved: _____
          ANDREW MARK THOMAS
          Assistant United States Attorney

Before:   HONORABLE JAMES C. FRANCIS IV
          United States Magistrate Judge
          Southern District of New York

U.S. DISTRICT COURT FILED JAN 15 2016 S.D. OF N.Y.

- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA          :   **COMPLAINT**
                                  :
          - v. -                  :   Violations of
                                  :   18 U.S.C. 1951 and 2
BORIS KOTLYARSKY, and             :
BORIS NAYFELD,                    :   COUNTY OF OFFENSE:
                                  :   NEW YORK
          Defendants.             :
                                  :
- - - - - - - - - - - - - - - - - x

DOC #_____

SOUTHERN DISTRICT OF NEW YORK, ss.:

   LUKE HARDISON, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

### COUNT ONE

(Conspiracy to Commit Hobbs Act Extortion)

   1.   From at least in or about October 2015, up to and including at least in or about January 2016, in the Southern District of New York and elsewhere, BORIS KOTLYARSKY and BORIS NAYFELD, the defendants, and others known and unknown, unlawfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit extortion, as that term is defined in 18 U.S.C. § 1951(b)(2), by obtaining money and property from and with the consent of another person, which consent would have been and was induced by the wrongful use of actual and threatened force, violence, and fear, and thereby would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in 18 U.S.C. § 1951(b)(3), and did aid and abet the same, to wit, KOTLYARSKY and NAYFELD collected and attempted to collect payment from a victim after informing the victim that NAYFELD had been asked to murder victim.

   (Title 18, United States Code, Section 1951.)

**COUNT TWO**

(Hobbs Act Extortion)

  2. From at least in or about October 2015, up to and including at least on or about January 14, 2016, in the Southern District of New York and elsewhere, BORIS KOTLYARSKY and BORIS NAYFELD, the defendants, and others known and unknown, unlawfully and knowingly committed and attempted to commit extortion, as that term is defined in 18 U.S.C. § 1951(b)(2), by obtaining money and property from and with the consent of another person, which consent would have been and was induced by the wrongful use of actual and threatened force, violence, and fear, and thereby would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in 18 U.S.C. § 1951(b)(3), and did aid and abet the same, to wit, KOTLYARSKY and NAYFELD collected and attempted to collect payment from a victim after informing the victim that NAYFELD had been asked to murder the victim.

  (Title 18, United States Code, Section 1951 and 2.)

  The bases for my knowledge and the foregoing charge are, in part, as follows:

  3. I have been a Special Agent with the FBI since 2012. I have also been personally involved in the investigation of this matter, and have been involved in numerous investigations and prosecutions of organized criminal activity. This affidavit is based upon my own observations, conversations with other law enforcement agents and others, and my examination of reports and records prepared by others. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

  4. Since in or about November 2015, the FBI has been investigating an extortion plot (the "Extortion Plot"). In the Extortion Plot, BORIS KOTLYARSKY, the defendant, brokered a deal between BORIS NAYFELD, the defendant, and an individual (the "Victim"), wherein the Victim was to pay NAYFELD approximately $125,000 in exchange for NAYFELD's promise to halt a pending contract for the Victim's murder.

2

5.     Based on conversations with the Victim, I have learned, in part, the following:

   a.    On or about October 31, 2015, BORIS KOTLYARSKY, the defendant, met the Victim at a restaurant in Brooklyn, New York. At the meeting, KOTLYARSKY informed the Victim, in substance and in part, that a Russian businessman (the "Businessman"), had approached BORIS NAYFELD, the defendant, with a contract to kill the Victim in exchange for a $100,000 payment. KOTLYARKSKY offered to broker a meeting between the Victim and NAYFELD.

   b.    The Victim understood KOTLYARSKY to be offering the Victim an opportunity to intercede with NAYFELD before NAYFELD killed the Victim.

   c.    The Victim then approached law enforcement to alert law enforcement to the situation.

6.     Based on physical surveillance conducted on December 3, 2015, I know, among other things, that the Victim met BORIS KOTLYARSKY, the defendant, at a restaurant in Brooklyn, New York ("Restaurant-1").

7.     At Restaurant-1, the Victim and BORIS KOTLYARSKY, the defendant, conversed primarily in Russian. The FBI provided the Victim with an audio recording device, and the Victim's conversation was audio recorded. Based on a review of a draft English-language transcription of that recording, I have learned, among other things, that KOTLYARSKY said, in substance and in part, the following:

   a.    The Businessman had approached BORIS NAYFELD, the defendant, about murdering the Victim.

   b.    KOTLYARSKY was willing to arrange a meeting between NAYFELD and the Victim.

8.     With the Victim's consent, the government intercepted and recorded telephone communications made through a cellphone used by the Victim ("Victim Cellphone"). The conversations on the Victim Cellphone occurred primarily in Russian. Based on interviews of the Victim and a review of call detail records, I know the conversations the Victim had on the Victim Cellphone between on or about December 23, 2015 and on or about January 13, 2016 were with BORIS KOTLYARSKY, the defendant.

9.     Based on a review of a draft English-language transcription of call to the Victim Cellphone on or about January 7, 2016, I have learned, among other things, that BORIS KOTLYARSKY, the

defendant, said, in substance and in part, the following:

    a.    The Victim should meet with BORIS NAYFELD, the defendant, the following day, on or about January 8, 2016.

    b.    The Victim could either attend the meeting and end the problem, or instead tell NAYFELD that he is busy and not come.

    c.    The Businessman had told NAYFELD he would pay money. If the Victim came to an agreement with NAYFELD, then NAYFELD would not take the Businessman's money and would instead tell the Businessman to get lost.

    10.    Based on a review of draft English-language transcriptions of a call received by the Victim Cellphone on January 8, 2016, I have learned, among other thing, the following:

    a.    BORIS KOTLYARSKY called the Victim and, in substance and in part, told the Victim he would be coming to the meeting.

    b.    KOTLYARSKY further said, in substance and in part, that he had a telephone call with BORIS NAYFELD, the defendant, and that NAYFELD was already at the restaurant where the meeting was to take place.

    11.    Based on physical surveillance conducted on January 8, 2016, I have learned, in part, the following:

    a.    On or about January 8, 2016, BORIS KOTLYARSKY and BORIS NAYFELD, the defendants, met the Victim at a restaurant in Brooklyn, New York ("Restaurant-2").

    b.    When the Victim entered Restaurant-2. KOTLYARSKY and NAYFELD, the defendants, were already present, along with another male ("CC-1").

    c.    NAYFELD, KOTLYARSKY, and CC-1 spoke together briefly. NAYFELD and the Victim then sat at one table and conversed. KOTLAYRSKY and CC-1 sat at a nearby table.

    d.    After speaking to NAYFELD for approximately two hours, the Victim departed Restaurant-2. After the Victim departed, NAYFELD and KOTLYARSKY departed together in an SUV driven by KOTLYARSKY. CC-1 departed in a separate vehicle.

    12.    At Restaurant-2, the Victim and BORIS KOTLYARSKY, the

4

defendant, conversed primarily in Russian. The FBI provided the Victim with an audio recording device, and the Victim's conversation was audio recorded. Based on a review of a draft English-language transcription of that recording, I have learned, among other things, that the following was said, in substance and in part:

   a. BORIS KOTLYARSKY, the defendant, introduced BORIS NAYFELD, the defendant, to the Victim before KOTLYARSKY stated that he would leave to allow the Victim and NAYFELD to discuss business.

   b. NAYFELD told the Victim that the Businessman transferred $50,000 to NAYFELD as partial payment on a contract for the Victim's murder. NAYFELD told the Victim what NAYFELD had said to the Businessman: the job would take two persons, and would cost $250,000.

   13. Based on physical surveillance conducted on or about January 11, 2016, I have learned, in part, the following:

   a. BORIS KOTLYARSKY and BORIS NAYFELD, the defendants, met the Victim at a restaurant in Brooklyn, New York ("Restaurant-3").

   b. KOTLYARSKY and NAYFELD traveled to Restaurant-3 in an SUV driven by KOTLYARSKY.

   c. NAYFELD and the Victim met inside Restaurant-3. KOTLYARSKY, joined by CC-1, walked across the street to another restaurant.

   d. After speaking to NAYFELD for approximately eighty minutes, the Victim departed. After the Victim departed, KOTLYARSKY and NAYFELD departed together in an SUV driven by KOTLYARSKY.

   14. At Restaurant-3, the Victim and BORIS NAYFELD, the defendant, conversed primarily in Russian. The FBI provided the Victim with an audio recording device, and the Victim's conversation was audio recorded. Based on a review of draft English-language transcriptions of the audio recording, I have learned, among other things, that the following was said, in substance and in part:

   a. NAYFELD told the Victim that it was good that KOTLYARSKY had intervened on the Victim's behalf.

   b. NAYFELD told the Victim to pay him $125,000, with $50,000 to be due by Friday, January 15, 2016.

15. Based on physical surveillance conducted on or about January 14, 2016, and an interview of the Victim,[1] I have learned, in part, the following:

    a. The Victim met BORIS NAYFELD, the defendant, at Restaurant-2.

    b. The Victim asked NAYFELD, in substance and in part, for assurances that the Victim would be safe. NAYFELD agreed to call the Businessman. The Victim dialed the Businessman's number on the Victim Cellphone, and handed the Victim Cellphone to NAYFELD. NAYFELD said aloud, in substance and in part, do not touch the Victim or I will harm you.

    c. In NAYFELD's presence, the Victim wrote a check, to be drawn on the account of the Victim's business, in the amount of $50,000 and signed it (the "Check"). The Check did not specify a recipient.

    d. NAYFELD departed Restaurant-3 with the Check in his possession. Immediately after NAYFELD left Restaurant-3, law enforcement officers approached him. NAYFELD then uttered an expletive and tore up the Check. NAYFELD was then arrested.

    e. Shortly after NAYFELD's arrest, BORIS KOTLYARSKY, the defendant, arrived outside Restaurant-2. KOTLYARSKY was then arrested.

16. Based on interviews of the Victim, I know, in part, the following:

    a. The Victim believes that the Businessman has paid BORIS NAYFELD, the defendant, to have the Victim killed. The Victim dealt with NAYFELD and BORIS KOTLYARSKY, the defendant, out of fear for the Victim's life and safety. The Victim believes that the Victim's conversations with NAYFELD and KOTLYARSKY have kept the Victim from being killed.

    b. The Victim operates an international shipping business located in Newark, New Jersey. The payment demanded of the Victim would have affected the Victim's business.

---

[1] The Victim's conversation at Restaurant-2 on January 14, 2016, which was conducted primarily in Russian, was audio recorded with the Victim's knowledge. The FBI is currently translating and transcribing the recording; I have not yet reviewed any transcription.

    c. KOTLYARSKY discussed the Victim's business with the Victim on calls on the Victim Cellphone. NAYFELD discussed the Victim's business with the Victim during the meetings between NAYFELD and the Victim.

    d. On or about January 9, 2016, while the Victim was in New York, New York, the Victim received a telephone call on the Victim Cellphone from KOTLYARSKY.

    e. On or about January 14, 2016, the Victim traveled to Restaurant-2 from New York, New York.

   WHEREFORE, I respectfully request that BORIS KOTLYARSKY and BORIS NAYFELD, the defendants, be imprisoned or bailed, as the case may be.

_____
LUKE HARDISON
Special Agent
Federal Bureau of Investigation


Sworn to before me this
15th day of January, 2016


_____
HONORABLE JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK